UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
DONALD FRANGIPANI,

                    Plaintiff,

             -against-

HBO; BRYANT GUMBEL; RICK BERNSTEIN;
ROSS GRENBURG;KIRBY BRADLEY; ANDREW
BENNETT;JOE PERSKIE; TRES DRISCOLL;
and ARMEN KETEYLAN,COLLECTORS UNIVERSE
INC., d/b/a PSA/DNA AUTHENTICATION SERVICES;
JAMES J. SPENCE, LLC, aka JAMES SPENCE
AUTHENTICATION; JAMES SPENCE,
individually; RICHARD SIMON SPORTS;
RICHARD SIMON, individually;

                  Defendants.

-------------------------------------------------------------------X

**COMPLAINT and
DEMAND FOR
JURY TRIAL**

Case No.: 08 cv 5675 (gbd)
 ECF Case

Judge Assigned:
Hon. George B. Daniels

      DONALD FRAGIPANI, by his attorneys, the STRAZZULLO LAW FIRM,

P.C., as and for his complaint against Defendants, based upon personal

knowledge with respect to himself and on information and belief with respect to

all other matters, alleges as follows:

### JURISDICTION and VENUE

1.    Plaintiff Donald Frangipani ("Frangipani") is a resident of the County of

      Kings, State of New York.

2.    Frangipani is a forensic document examiner and handwriting expert, with

      over forty years of experience in the scientific field of Forensic Document

      Examination.

3.     Upon information and belief, Time Warner Entertainment Company, L.P., a publicly traded Delaware Corporation, and the largest cable provider in the world, is the parent company of Defendant Home Box Office (HBO).

4.     Defendant HBO, a division of Time Warner Entertainment Company, L.P., provides two 24-hour premium TV services, HBO and Cinemax, to subscribers across the United States via cable and satellite.  HBO has offices at 1100 Avenue of the Americas, New York, New York  10036, and does business all over the country, including New York.  Defendant HBO is part of the "HBO Defendants" referred to below.

5.     Defendant Bryant Gumbel is the host of HBO's show, Real Sports, and Defendants Rick Bernstein, Ross Greenburg, Kirby Bradley, Andrew Bennett, Joe Perskie, Tres Driscol, and Amen Keteylan (collectively "HBO Defendants") produced and narrated a segment on Real Sports entitled "Forgers Paradise", which defamed Plaintiff.

6.     The acts of HBO, and each employee, agent and representative thereof, are deemed to be the acts of, and chargeable to and binding upon HBO.

7.     Upon information and belief, Defendant Collectors Universe, Inc. is a publicly traded Delaware corporation, having offices at 1921 E. Alton Avenue, Santa Ana, California 92705, and is engaged in business all over the United States and in New York.

8.     Defendant Collector's Universe, Inc., ("Collectors") is the parent company of PSA/DNA Authentication Services ("PSA").

9.      Upon information and belief, PSA is a Delaware corporation, having

offices at Alton Avenue, Santa Ana, California 92705.

10.     PSA is an autograph authentication provider.  PSA does business in

New York and all over the United States.

11.     Upon information and belief, Defendant James J. Spence, LLC, also

know as James Spence Authentication, LLC, ("JSA") is a limited liability

company with offices at 2 Sylvan Way, Suite 102, Parsippany, New

Jersey 07054.

12.     James Spence is the owner of JSA, and holds himself out as a

professional autograph authenticator.

13.     JSA and James Spence (collectively "Spence Defendants") provide

autograph authentication services for sports memorabilia, and do

business all over the country, and in New York.

14.     The acts of the Spence Defendants, and each employee, agent and

representative thereof, are deemed to be the acts of, and are chargeable

to and binding upon JSA and James Spence individually.

15.     Richard Simon is the owner of Richard Simon Sports ("RSS"). Richard

Simon lives in New York City, and his business, RSS, is located in New

York City.  Richard Simon and RSS (collectively the "Simon

Defendants") do business as an autograph and sports memorabilia

authenticator.

16.    The acts of the Simon Defendants, and each employee, agent and
       representative thereof, are deemed to be the acts of, and are chargeable
       to and binding upon RSS and Richard Simon individually.

17.    The acts committed by the Defendants Collectors, PSA, the Spence
       Defendants and the Simon Defendants were done by its agents
       personally either while present in, or by use of the mails, telephones and
       other instrumentalities of interstate commerce to and from New York and
       elsewhere.

### FACTS REGARDING HBO'S DEFAMATION OF PLAINTIFF

18.    Since 1959 to date, Frangipani has received education and training in
       the examination and identification of handwriting and document
       examination.  From the mid 1970's to the present, Frangipani has
       qualified as a document expert on a continuous basis in various Federal
       and State courts, including but not limited to the Eastern and Southern
       Districts of New York, and the Supreme Courts of Kings, Queens, New
       York, Bronx, Suffolk, and Nassau Counties.  Frangipani has also been
       appointed as an independent expert by the federal court system.

19.    In the early 1990's, Frangipani began examining various types of items
       signed by celebrities, including political and sports figures
       ("memorabilia").

20.    In the late 1990's, Frangipani became one of the top autograph authenticators in the memorabilia business, and in particular, the sports memorabilia business.

21.    Frangipani would inspect the signed item and subject it to a forensic examination to determine whether or not it was authentic.  If Frangipani determined the signature and item were authentic, he would issue a Certificate of Authentication ("COA").

22.    Collectors of memorabilia use the COAs as evidence that the item is genuine.  When the collector buys or sells an item of memorabilia, he or she normally requires a COA prior to purchase or sale.

23.    In late 1990's, with the advent of eBay, the marketplace became inundated with forged sports and celebrity memorabilia.

24.    In the late 1990's the Federal Bureau of Investigations ("F.B.I.") began an ongoing campaign to rid the marketplace of forged sports and celebrity memorabilia, dubbed Operation Bullpen.

25.    The F.B.I. uncovered a forgery ring of sports memorabilia and certificates of authentication, led by the Marino Family.   The forgery ring would forge signatures on various sports memorabilia, and sell them as authentic.

26.    The forgery ring would also forge COAs for forged items.  The forgery ring would submit genuine items and obtain legitimate COAs from authenticators.  Then, unbeknownst to the authenticator, the forgery ring

would then forge the authenticator's COA and use the forged COAs to sell the forged memorabilia.

27.    After a three-year investigation, in 2000, the F.B.I. seized an alleged $10 million in counterfeit memorabilia.  The F.B.I. arrested forgers, owners of memorabilia shops who knowingly sold the forged items, as well as persons who knowingly authenticated fraudulent memorabilia and issued fraudulent COA's.

28.    One of the distributors of the Marino Family's forged memorabilia was Sheldon Jaffe ("Jaffe").  Facing long prison sentences for federal fraud charges and filing false income tax returns, Jaffe pled guilty and received a lesser sentence.

29.    During the investigation, the F.B.I. spoke with Plaintiff Donald Frangipani concerning items that Jaffe had sent to Frangipani for examination.

30.    In total, Frangipani had examined 474 pieces sent to him by Jaffe. Frangipani rejected fifty (50) to sixty (60) of these items.   It is unknown how many of the items, if any, provided by Jaffe to Frangipani were fake, as the ring routinely submitted authentic items in order to obtain legitimate COAs, from which the ring forged COAs to accompany fraudulent items.

31.    As the result of Operation Bullpen, it was revealed that not only was the forgery ring forging autographs on memorabilia, it was also forging

Frangipani's COA's.  Frangipani did not learn that his COAs were being forged until it was revealed by Operation Bullpen.

32.    Also seized from the Marino warehouse was a box of forged COA's on which Frangipani's name had been placed.

33.    Frangipani was never accused of any wrongdoing or indicted by the F.B.I. in Operation Bullpen, and was certainly never convicted of any wrongdoing.

34.    On January 17, 2006, HBO released a segment on the Bryant Gumbel show, Real Sports, entitled "Forger's Paradise" ("the segment").  The segment was aired by HBO and produced by Rick Bernstein, Ross Greenburg, Kirby Bradley, Andrew Bennett, Joe Perskie, and Tres Driscol; Armen Keteylan was the narrator and newscaster; and Bryant Gumbel hosted the show ( collectively "HBO Defendants").

35.    Upon information and belief, the segment has been aired on HBO numerous times in the past year.

36.    Upon information and belief, in the past year, HBO continues to offer the segment to customers for viewing on demand.

37.    The segment concerned the creation and sale of fake signed sports memorabilia sold to the public over the internet.

38.    In the segment, the HBO Defendants relied upon information provided by Jaffe, a convicted felon who is very hostile to Frangipani.

39.   Upon information and belief, Jaffe is close with Richard Simon, who has also demonstrated extreme hostility to Frangipani.

40.   The HBO Defendants permitted Jaffe to appear in the segment under a false name, "Eddie," and did not show his face.

41.   The HBO Defendants further relied upon statements made by F.B.I. agent Tim Fitzsimmons almost six years earlier, without verifying the continued accuracy of such statements.

42.   As stated by Defendant Keteylan in the segment, "[f']or years [Eddie] flooded the market with fakes distributing the handiwork of this man, Greg Marino, an aspiring California artist whose finest work turned out to be other people's signatures."

43.   As revealed by Jaffe in the segment, Jaffe would call Greg Marino and order a certain number of signed sports memorabilia.  Greg Marino would forge the signatures on the memorabilia and ship the items to Jaffe.

44.   Jaffe then claimed he would send the forged items to authenticators, who would certify the item as authentic, and provide a Certificate of Authentication ("COA").

45.   In the segment, Jaffe stated:  "Now you talk about a certificate of authenticity, this was a scam like no other.  I have to tell you the only reason this forgery ring worked were we were able to find quote unquote forensic experts."

46.    Defendant Keteylan then defamed Plaintiff by stating that "Eddie's
[forgery] ring used several of them [forensic experts], but one, the F.B.I.
says soon became their quote authenticator of choice, a licensed
forensic expert from Brooklyn named Donald Frangipani."

47.    This statement was false.  First, there is no evidence, except for Jaffe's
statement, that the items submitted to Frangipani were forgeries.

48.    Secondly, Frangipani was not the "authenticator of choice" as alleged by
HBO, as the number of items submitted by the forgery ring to Frangipani
for examination were miniscule compared to the hundreds of thousands
of items seized by the F.B.I.

49.    While making this statement, the camera then showed a box full of
pieces of paper, individually placed in plastic sheets, with Plaintiff Donald
Frangipani's name on the letterhead.  The clear implication was that
Plaintiff Donald Frangipani had provided this box full of fake COA's for
forged items.

50.    The HBO Defendants were grossly irresponsible and biased, and acted
with malice, in leading the viewer to such a defamatory and false
conclusion, as they knew full well that the box of COAs they showed in
the segment were not COAs provided by Frangipani for fake
memorabilia but were COAs forged by the forgery ring.

51.    The segment then played a tape made by the F.B.I. of Jaffe speaking to
an unidentified person who asked, "Still have somebody that can cert my

shit?"  Jaffe answered, "Frangipani."  The unidentified person then stated

on the tape, "Frangipani, yeah he does everybody's shit, doesn't he?"

These statements, as aired by HBO, were meant to lead the viewer to

falsely conclude that Frangipani was the "authenticator of choice" for

forged items submitted by the Marino family.

52.    The HBO Defendants were grossly irresponsible and acted with malice

when they repeated these statements without confirming the truthfulness

of them, and led the viewer to such false and defamatory conclusions.

53.    Jaffe then stated in the segment, "I'd send him [Frangipani] a few items,

came back to me overnight, all authenticated, tried a few more items,

and slowly but surely there wasn't anything that was turned down."  This

statement, aired by the HBO Defendants, was false as Frangipani had

declined fifty (50) to sixty (60) items sent by Jaffe.  The HBO Defendants

were grossly irresponsible and acted with malice in repeating these

statements without confirming the truthfulness of them.

54.    Defendant Keteylan then stated, "So if you had a fake document and you

wanted somebody to approve it would have been …." And Jaffe stated, "

-- directed directly to him [Frangipani]."  Again, the HBO Defendants

repeated this false statement and defamed Plaintiff, without confirming

the truthfulness of it.

55.    Defendant Keteylan then stated, "All told, Frangipani issued COAs for

thousands of pieces sent to him by Eddie's ring -- COAs that can now be

found by the box load in Tim Fitzsimmons warehouse." This statement was false. Upon examination, the COAs shown by HBO were not COAs produced by Frangipani, but were COAs forged by the forgery ring on Frangipani's letterhead.

56.     Defendant Keteylan then stated, "Remember all those Babe Ruth signatures that the F.B.I. seized. Well, we saw the COA's for a whole shipment of what should have been of course rare signatures." Again, the camera showed the box of alleged Frangipani COAs, and indicated that many of the alleged Frangipani COA's had the date September 16, 1999. Again, the implication by the HBO Defendants was that Frangipani had provided these COA's for fake memorabilia, which was false. The HBO Defendants were grossly irresponsible and acted with malice in leaving the viewer with this impression, as the F.B.I. investigation showed that the box of COAs shown on camera were not provided by Frangipani, but were forged Frangipani COAs made by the forgery ring.

57.     The HBO Defendants' investigation into this matter was biased and grossly irresponsible. It relied on statements of Jaffe, a convicted felon who is hostile to Frangipani, and outdated information from F.B.I. Agent Tim Fitzsimmons.

58.     The HBO Defendants' investigation and segment was designed to confirm a hostile premise rather than find the truth.

59.    As admitted by the HBO Defendants in the segment, Frangipani was
       never charged with any involvement in the forgery ring.  This fact should
       have alerted the HBO Defendants that what Jaffe was saying was false.
       For if in fact Frangipani were the "authenticator of choice," he would
       have been at least indicted, which he was not.

60.    The HBO Defendants were on notice that Frangipani had not been
       indicted or accused of any wrongdoing.  They were well aware that they
       were taking the word of a convicted con man.  They were well aware
       they were relying on statements made by F.B.I. agent Tim Fitzsimmons
       made years earlier before the investigation was concluded.  In spite of
       this, the HBO Defendants acted in a grossly irresponsible manner,
       without due consideration for the standards of information gathering
       ordinarily followed by responsible parties.

61.    The HBO Defendants continued to demonstrate their bias and defame
       Frangipani for the remainder of the segment.  The HBO Defendants
       "borrowed" alleged fake items of sports memorabilia from Jaffe.

62.    Defendant Keteylan wore a hidden camera and surreptitiously provided
       Frangipani with these "borrowed" items to examine.  In the segment,
       Keteylan is shown presenting Frangipani with the items.

63.    The segment shows Frangipani looking at items presented by Keteylan,
       and Frangipani stating, "Your stuff, there's no problem with …" – and the
       segment is edited, cutting out the remainder of Frangipani's statement,

which was to the effect that Keteylan had to leave the items so Frangipani could conduct a more thorough investigation.   The HBO Defendants deliberately edited the tape to mislead viewers into believing that Frangipani approved the items without really examining them, furthering the HBO Defendants' crusade in portraying Frangipani as a fraudulent authenticator, who will "certify anything."

64.   The HBO Defendants deliberately omitted that part of the interview wherein Frangipani clearly told Keteylan that Frangipani was only giving a first glimpse opinion, and that Frangipani had to keep the items to conduct a full examination before he could render an opinion.  The HBO Defendants deliberately omitted from the segment the fact that Frangipani kept the items for a week and conducted a complete forensic examination on the items prior to giving his opinion.

65.   A week or so after dropping off the items, HBO Defendant Keteylan returned to Frangipani's office and informed Frangipani that the seven items he had just authenticated were "fake."  The HBO Defendants based this assertion on the word of a convicted felon, Jaffe, that the items were fake, without subjecting the items to an unbiased opinion.

66.   Frangipani asked, "Who said they were fake?"  The narration of the segment then stated, "We told him we got them [the seven items] straight from his old source.  Frangipani didn't deny certifying all those

fakes from Eddie's ring but said he had just been fooled by the forgeries
and he had rejected plenty too."

67.    This statement is false.  The statement leads the viewer to believe that
Frangipani didn't deny certifying thousands or millions of forged items
from the forgery ring," when in fact, Frangipani does deny doing so, as it
has never been proven that any items presented to Frangipani were
forged.

68.    The HBO Defendants were clearly biased in their portrayal of Frangipani,
and acted with malice against Frangipani.  They had their minds made
up about Frangipani, and acted in a grossly irresponsible manner by
collecting evidence to support their pre-judgments, rather than
conducting an unbiased investigation.

## FACTS REGARDING COLLECTORS, PSA, SPENCE DEFENDANTS AND SIMON DEFENDANTS

69.    In 1999, Defendant Collectors Universe, Inc. formed subsidiary PSA to
take advantage of the growing autographed memorabilia market.

70.    In 1999, Frangipani was one of a handful forensic examiners that
examined autographed memorabilia and was thus one of PSA's largest
competitors.

71.    In an effort to eliminate competition in the industry, Collectors, PSA, the
Spence Defendants and the Simon Defendants reject items of

memorabilia previously authenticated by Plaintiff without conducting a proper examination of the item.

72. As a result of Defendants' fraudulent acts, Plaintiff's customers, the public and others in the industry will no longer engage Plaintiff's services, as they fear that their items will be declared fake or not authentic by PSA, the Spence Defendants or the Simon Defendants if item has previously been authenticated by Plaintiff.

73. Collectors, PSA, the Spence Defendants and the Simon Defendants have engaged in a campaign of fraud and defamation against Plaintiff Frangipani and consumers in an effort to eliminate Frangipani's competition in the industry.

74. Further, Collectors, PSA, the Spence Defendants and the Simon Defendants advertise and take money from members of the public to allegedly examine an item of memorabilia to determine whether or not it is authentic.  The examinations they conduct on an item previously authenticated by Frangipani cannot possibly make such a determination and are fraudulent.  Collectors, PSA, the Spence Defendants and the Simon Defendants have engaged in a campaign of fraud against the public by performing fraudulent examinations of memorabilia.

75. Collectors and PSA further defraud the public and Plaintiff by examining scanned items of memorabilia and then giving a "quick opinion" as to whether the item is likely to be genuine or not.

## FIRST CAUSE OF ACTION

### (Defamation)

### (Against HBO Defendants)

76.     Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

77.     In or about January 2006, HBO released a segment on the Bryant Gumbel show, Real Sports, entitled "Forger's Paradise" (the "segment"). The segment was produced by Rick Bernstein, Ross Greenburg, Kirby Bradley, Andrew Bennett, Joe Perskie, and Tres Driscol; Armen Keteylan was the narrator and newscaster; and Bryant Gumbel hosted the show ("HBO Defendants").

78.     Upon information and belief, the segment has been rebroadcast on HBO to the public in the past twelve months.

79.     Additionally, the segment has been rebroadcast this year to customers who pay for the show "on demand."

80.     The HBO Defendants defamed Plaintiff in the segment by falsely stating that Frangipani was the "authenticator of choice" of a forgery ring.

81.     The HBO Defendants further defamed Plaintiff by misleading the viewers into believing that a box of documents shown in the segment contained original COAs prepared by Frangipani which authenticated fake items.

82.     In fact, the box shown contained COAs forged by the forgery ring, with which Frangipani had nothing to do.

83.    Defendants further defamed Plaintiff by airing false statements made by Jaffe, including but not limited to that Frangipani would not turn anything down.

84.    Defendants further defamed Plaintiff by editing the conversation with Plaintiff in such a way that the public was led to believe that Plaintiff did not deny certifying thousands or millions of forgeries for a forgery ring.

85.    These statements concerning Plaintiff were false and defamatory.

86.    Prior to airing the segment, on or about January 16th, 2006 and January 17, 2006, Plaintiff's attorney spoke with representatives from HBO, and followed up with an email to HBO representatives, and informed Defendants that the segment defamed Plaintiff, did not accurately portray Plaintiff or the circumstances involving Plaintiff, and would interfere with Plaintiff's business, and requested that HBO not air the segment.

87.    Defendants did not respond to Plaintiff's requests.

88.    Defendants' investigation into the statements and allegations contained in the segment were grossly irresponsible and biased against Plaintiff.

89.    Defendants were grossly irresponsible in investigating, producing and airing this segment, and acted without due consideration for the standards of information-gathering and dissemination ordinarily followed by responsible parties.

90.    The statements made by Defendants were made with actual malice. The Defendants published said statements with reckless disregard of whether they were true or not.

91.    These statements have subjected Plaintiff to public disgrace and ridicule.

92.    As the result of the publication of the segment, Plaintiff has sustained injury to his business and his personal reputation and standing in the community.  Further, Plaintiff has suffered extreme pain and mental anguish.

93.    Plaintiff has suffered damages, including pain and suffering, in an amount to be determined at trial, but no less than Five-Million Dollars ($5,000,000.00), and punitive damages in an amount to be determined at trial, for which the HBO Defendants are jointly and severally liable.

## SECOND CAUSE OF ACTION

(CO)

### (Against Collectors & PSA)

94.    Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

95.    Collectors & PSA have engaged in a pattern of racketeering by committing more than two acts of racketeering activity within the past ten years.  Each such act of racketeering activity was related, had similar purpose, involved the same or similar participants and methods of

commission and had similar results impacting upon similar victims, including Frangipani.

96. Through a pattern of racketeering activity, namely, fraud, PSA has conducted and participated in the affairs of PSA as an enterprise.

97. Through a pattern of racketeering activity, namely, fraud, Collectors has conducted and participated in the affairs of Collectors as an enterprise.

98. With respect to their violations of 18 U.S.C. § 1962(c), Collectors and PSA have acted with malice toward Frangipani, and with specific intent to commit the predicate acts alleged herein and to participate in the PSA and Collectors Enterprises.

99. Collectors and PSA are an "enterprise" as that term is defined in 18 U.S.C. § 1961, engaged in interstate commerce and the activities of which affect interstate commerce.  Such activities in and affecting interstate commerce include, *inter alia*, providing authentication services for autographed memorabilia to individuals, businesses, associations and corporations, who buy and sell autographed memorabilia.

100. These two enterprises have conducted their affairs through a pattern of racketeering activity.

101. As the parent company, Collectors has participated in and approved of PSA's actions described above and below, and is jointly and severally liable for all damages caused by PSA's actions.

102.    From 2003 to the present, PSA advertise and inform the public that they will examine signed memorabilia to determine if the item is authentic.

103.    When a customer presents an item to PSA that has been previously authenticated by Frangipani, PSA claims it has examined the item and found it not to be authentic, when in fact it is automatically rejecting the item just because Frangipani previously authenticated it.

104.    The examinations that PSA conducts on items previously authenticated by Frangipani are fraudulent, as PSA is not examining the item as claimed. It is merely rejecting the item as not authentic because Frangipani previously authenticated it.

105.    Not only are the alleged examinations fraudulent, the actual opinions issued by PSA are fraudulent.

106.    After rejecting the item solely because Frangipani had previously authenticated it, rather than performing an examination upon the item as claimed, PSA sends "rejection letters" in the mail to the customers. These "rejection letters" assert that the item is not real based upon a "thorough examination". In the past six years, Defendants have mailed hundreds, if not thousands of such fraudulent rejection letters.

107.    Those seeking authentication of memorabilia no longer seek the opinion or services of Plaintiff as they know that if their item has previously been authenticated by Plaintiff, the item will automatically be rejected and declared a fake by PSA.

108.   The fraudulent actions of PSA have been committed with the intention of influencing the public to no longer utilize Plaintiff's authentication services, thereby eliminating Plaintiff as a competitor and capturing the business for PSA.

109.   Collectors' and PSA's fraudulent scheme has been pervasive, ongoing, and debilitating to the conduct of Plaintiff's business.

110.   As the result of Collectors' and PSA's systemic nationwide pattern of racketeering, customers and the public have relied upon Defendants' statements and ceased using Plaintiff's services.  Collectors' and PSA's acts have had reverberating consequences for the integrity of Plaintiff's operations beyond those attributable to the fraudulent acts set forth below.

111.   Further, for a fee, PSA provides a "quick opinion" service to the public. PSA examines a photo of an item scanned into a computer and then renders an opinion as to whether the item is likely genuine or not.

112.   PSA's "quick opinion" services are fraudulent as there is no way to tell from a scanned image whether or not an item is genuine.

113.   PSA makes this representation knowing that it is false.

114.   PSA's customers rely on PSA's representation that they can examine a scanned image and render a "quick opinion" as to whether the item is likely genuine or not, and pay PSA for such services.

115.    PSA then issues fraudulent "quick opinions" through the mail and over the internet.

116.    As the result of PSA's systemic nationwide pattern of racketeering through the use of "quick opinions", PSA has defrauded the public out of millions of dollars for fraudulent and worthless services.  Many items of memorabilia have been incorrectly identified as likely genuine when they were not authentic, or identified as not likely genuine, when they were authentic, including pieces identified by Frangipani.  PSA's improper and incorrect "quick opinions" have harmed Plaintiff, other authenticators and the public, and have had reverberating consequences for the integrity of Plaintiff's operations beyond those attributable to the fraudulent acts set forth above.

117.    As a direct and proximate result of Defendants' fraudulent conduct and statements, in violation of 18 U.S.C. § 1962(c), Frangipani has been, and continues to be, injured in his business or property in the sum of Three-Million Dollars ($3,000,000.00), trebled, with costs and attorney's fees.

**THIRD CAUSE OF ACTION**

**(Antitrust and Unfair Competition, 15 U.S.C. § 1)**

**(Against Collectors, PSA, JSA & James Spence)**

118.    Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

119. Collectors, PSA, James Spence and JSA have conspired to eliminate competition from Plaintiff in the signature authentication industry nationwide.

120. The actions of Collectors, PSA, James Spence and JSA, and have had an adverse anticompetitive effect upon trade in the authentication industry.

121. As the direct result of the anticompetitive actions of Collectors, PSA, James Spence and JSA, Plaintiff's business has been adversely affected.

122. Plaintiff has been and continues to be injured as the result of Defendants' actions in a sum to be determined at trial, but not less than Five-Million Dollars ($5,000,000), trebled, plus attorneys' fees and costs of suit including disbursements.

### FOURTH CAUSE OF ACTION

**(ud )**

**(Against Collectors & PSA)**

123. Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

124. As set forth above, PSA and/or its representatives, knowingly and fraudulently made numerous false statements to the public and Plaintiff's customers regarding Plaintiff's previous authentications of memorabilia.

125.  As set forth above, PSA and/or its representatives, knowingly and fraudulently asserted they conducted examinations on memorabilia previously authenticated by Frangipani, and that their examination revealed that the items were fake or not authentic.   In fact, Defendants did not conduct an examination of the items, but asserted that the items were not authentic only because Frangipani had previously authenticated the items.

126.  Additionally, PSA's "quick opinion" services are in and of themselves an act of fraud.  The opinions issued by PSA are also fraudulent.

127.  PSA's fraudulent schemes have been pervasive, ongoing, and debilitating to the conduct of Plaintiff's business.

128.  As the result of PSA's systemic nationwide pattern of fraud, customers and the public have relied upon Defendants' fraudulent claims that they have conducted examinations of memorabilia to determine authenticity of the items, and have paid Defendants money for such alleged services.

129.  As the result of PSA's systematic nationwide pattern of fraud, customers and the public have relied upon Defendants' fraudulent conclusions regarding the authenticity or lack of authenticity of memorabilia, to their detriment.

130.  As the parent company of PSA, Collectors has conspired with PSA to commit said fraud.

131.   As the parent company of PSA, Collectors have approved the fraudulent

actions of PSA.

132.   As the parent company of PSA, Collectors is jointly and severally liable

for all damages caused by PSA's fraud against Plaintiff.

133.   Plaintiff has been and continues to be injured as the result of PSA's

fraudulent statements and acts in a sum to be determined at trial, but not

less than Three-Million Dollars ($3,000,000.00).

## **FIFTH CAUSE OF ACTION**

### **(Gen. Bus. Law § 349)**

### **(Against Collectors & PSA**

134.   Plaintiff hereby re-alleges all foregoing paragraphs and incorporates

them by reference.

135.   New York's Consumer Protection Act, N.Y. Gen. Bus. Law § 349  makes

unlawful deceptive acts in the conduct of any business, trade or

commerce or in the furnishing of any service in this State.

136.   PSA made materially deceptive statements when they told the public

and customers that they had inspected items previously authenticated by

Plaintiff, and had rejected these items as not authentic based upon an

actual examination of the item.

137.   PSA committed deceptive business practices when they alleged that

they were inspecting various items for authenticity, took money for said

alleged acts, but in fact did not perform a proper examination that would allow them to determine whether or not an item was authentic.

138.  PSA committed deceptive business practices when they alleged they could give "quick opinions" as to whether an item was likely or not likely genuine.

139.  As the result of these materially deceptive statements and practices, PSA led many customers and the public to believe that an item was not authentic, when in fact it was.  The result of this practice is that many authentic, valuable, and historic items have been destroyed or have lost their place in history, and the public has been harmed.

140.  PSA's deceptive business practices have caused harm to Plaintiff's business and goodwill and reputation, as well as the public.

141.  As the parent company of PSA, Collectors has conspired with PSA to commit said fraud.

142.  As the parent company of PSA, Collectors have approved the fraudulent actions of PSA.

143.  As the parent company of PSA, Collectors is jointly and severally liable for all damages caused by PSA's fraud against Plaintiff

144.  As a direct and proximate result of PSA's deceptive business practices under Gen. Bus. Law § 349(a), Plaintiff has and continues to suffer damages from PSA's actions in an amount to be determined at trial, but not less than Three-Million Dollars ($3,000,000.00), plus punitive

damages, including Plaintiff's costs of suit and reasonable attorney's

fees in bringing this action

145. Additionally, Defendants should be enjoined from engaging in these

deceptive practices.

## SIXTH CAUSE OF ACTION

### Tortious Interference With Business Relations & Prospective Business Relations

### (Against Collectors & PSA)

146. Plaintiff hereby re-alleges all foregoing paragraphs and incorporates

them by reference.

147. Prior to June 2005, Plaintiff had business relationships with various

collectors and members of the public who relied upon Plaintiff's services

to determine the authenticity of sports and other entertainment

memorabilia.

148. PSA was were aware of these relationships by virtue of the Frangipani

COAs that accompany the memorabilia.

149. When presented with an item with an item of memorabilia accompanied

by a COA from Frangipani, PSA would claim to examine the item and

determine it was not authentic.  However, PSA was in fact not examining

the items, but systematically rejecting the item as not authentic, just

because it Frangipani's COA was attached to the item.

150. As the result of this wrongful and fraudulent systematic practice, PSA convinced collectors and members of the public to not utilize Plaintiff's services and to not enter into a business relationship with Plaintiff.

151. But for PSA's actions, these customers of Plaintiff's would have continued to enter into a business relationship with Plaintiff.

152. But for PSA's actions, these collectors and members of the public would have entered into business relationships with Plaintiff.

153. PSA maliciously, knowingly, and intentional interfered with the current and prospective contracts and business of Plaintiff with third parties. Were it not for PSA's improper interference, Plaintiff would have had economic opportunities from which he would have profited.

154. As the parent company of PSA, Collectors has conspired with PSA to interfere with Plaintiff's business.

155. As the parent company of PSA, Collectors have approved the tortious actions of PSA.

156. As the parent company of PSA, Collectors is jointly and severally liable for all damages caused by PSA's tortious interference with Plaintiff's business.

157. Plaintiff suffered damages from PSA's acts in an amount to be determined at trial, but in no event less than Three-Million Dollars ($3,000,000.00).

**<u>SEVENTH CAUSE OF ACTION</u>**

**(Libel Per Se)**

**(Against Collectors & PSA)**

158.   Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

159.   PSA maliciously and willfully injured Plaintiff's good name, reputation and skills as a forensic examiner, impeaching the integrity of Plaintiff's business services.

160.   PSA's automatic rejection of any item previously authenticated by Plaintiff has damaged Plaintiff's business.  Defendants' actions give the impression that Plaintiff is dishonest, a swindler and engaged in misrepresentation, fraud and conducting a racket.

161.   PSA's actions and statements have exposed Plaintiff to hatred, contempt and have induced an unsavoury opinion of him in the minds of the sports memorabilia community and the public.

162.   PSA knows that its claims regarding Plaintiff are false, and they have intentionally injured Plaintiff in an effort to capture his business for themselves.

163.     Plaintiff's clients and the public no longer employ Plaintiff's authentication services because they know that if the piece is taken to PSA, it will be rejected as a fake, and will become less valuable in the marketplace.

164. As the parent company of PSA, Collectors has conspired with PSA to commit said defamation.

165. As the parent company of PSA, Collectors have approved the defamation by PSA.

166. As the parent company of PSA, Collectors is jointly and severally liable for all damages caused by PSA's defamation against Plaintiff

167. As a direct and proximate result of PSA's statements and actions, Plaintiff has suffered damages and injury in an amount to be determined at trial, but in on event less than Three-Million Dollars ($3,000,000.00) in damages and punitive damages, plus costs of suit, including disbursements.

## **EIGHTH CAUSE OF ACTION**

### **(Intentional Falsehood)**

### **(Against Collectors, & PSA)**

168. Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

169. PSA has maliciously circulated, for the purpose of harming Plaintiff and his business, untrue statements about Plaintiff; namely, that they conducted examinations on the sports memorabilia previously authenticated by Frangipani; and that the items were fake. Both of these representations are false.  PSA was not actually conducting examinations that would permit it to determine whether or not an item

was genuine, but were automatically rejecting the item because it had been previously authenticated by Plaintiff.    Thus, PSA has labeled many genuine items as fake, committing yet another fraud.

170.    PSA knew that its actions and statements would harm Plaintiff and his business and injure his reputation.

171.    As the result of PSA's statements and actions, Plaintiff has lost many clients.  Customers that had previously utilized Plaintiff's services now refuse to do so.

172.    As the parent company of PSA, Collectors has conspired with PSA to commit said tort.

173.    As the parent company of PSA, Collectors have approved the tortious actions of PSA.

174.    As the parent company of PSA, Collectors is jointly and severally liable for all damages caused by PSA's tortious conduct against Plaintiff.

175.    As a direct and proximate result of PSA's statements and actions, Plaintiff has suffered damages and injury in an amount to be determined at trial, but in no event less than Three-Million Dollars ($3,000,000.00) and punitive damages, and costs of suit, including disbursements.

## NINTH CAUSE OF ACTION

**(Defamation)**

**(Against Collectors, & PSA)**

176.  Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

177.  PSA has maliciously circulated, for the purpose of harming Plaintiff and his business, untrue statements about Plaintiff; namely, that they conducted examinations on the sports memorabilia previously authenticated by Frangipani; and that the items were fake. Both of these representations are false.  PSA was not actually conducting examinations that would permit it to determine whether or not an item was genuine, but was automatically rejecting the item because it had been previously authenticated by Plaintiff.    Thus, PSA has labeled many genuine items as fake, committing yet another fraud.

178.  PSA knew that its actions would harm Plaintiff and his business and injure his reputation.

179.  As the result of PSA's statements and actions, Plaintiff has lost many clients.  Customers that had previously utilized Plaintiff's services now refuse to do so.

180.  As the parent company of PSA, Collectors has conspired with PSA to commit said tort.

181.  As the parent company of PSA, Collectors have approved the tortious actions of PSA.

182.  As the parent company of PSA, Collectors is jointly and severally liable for all damages caused by PSA's tortious conduct against Plaintiff

183.  As a direct and proximate result of Defendants' statements and actions, Plaintiff has suffered damages and injury in an amount to be determined at trial, but in no event less than Three-Million Dollars ($3,000,000.00) and punitive damages, and costs of suit, including disbursements.

### TENTH CAUSE OF ACTION

### (CO)

### (Against JSA)

184.  Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

185.  JSA has engaged in a pattern of racketeering by committing more than two acts of racketeering activity within the past ten years.  Each such act of racketeering activity was related, had similar purpose, involved the same or similar participants and methods of commission and had similar results impacting upon similar victims, including Frangipani.

186.  JSA  is an "enterprise" as that term is defined in 18 U.S.C. § 1961, engaged in interstate commerce and the activities of which affect interstate commerce.  Such activities in and affecting interstate commerce include, *inter alia*, providing authentication services for autographed memorabilia to individuals, businesses, associations and corporations, who buy and sell autographed memorabilia.

187.  Through a pattern of racketeering activity, namely, fraud, JSA has conducted and participated in the affairs of JSA as an enterprise.

188.   With respect to its violations of 18 U.S.C. § 1962(c), JSA has acted with malice toward Frangipani, and with specific intent to commit the predicate acts alleged herein and to participate in the JSA Enterprise.

189.   From 2003 to the present, JSA advertises and informs the public that it will examine signed memorabilia to determine if the item is authentic.

190.   When a customer presents an item to JSA that has been previously authenticated by Frangipani, JSA claims it has examined the item and found it not to be authentic, when in fact it is automatically rejecting the item just because Frangipani previously authenticated it.

191.   The examinations that JSA conducts on items previously authenticated by Frangipani are fraudulent, JSA is not examining the item as claimed. It is merely rejecting the item as not authentic because Frangipani previously authenticated it.

192.   Not only are the alleged examinations fraudulent, the actual opinions issued by JSA are fraudulent.

193.   After rejecting the item solely because Frangipani had previously authenticated it, rather than performing an examination upon the item as claimed, JSA sends "rejection letters" in the mail to the customers. These "rejection letters" assert that the item is not real based upon a "thorough examination".  In the past six years, JSA has mailed hundreds, if not thousands of such fraudulent rejection letters.

194.    Those seeking authentication of memorabilia no longer seek the opinion
or services of Plaintiff as they know that if their item has previously been
authenticated by Plaintiff, the item will automatically be rejected and
declared a fake by JSA.

195.    The fraudulent actions of JSA have been committed with the intention of
influencing the public to no longer utilize Plaintiff's authentication
services, thereby eliminating Plaintiff as a competitor and capturing the
business for Defendant.

196.    JSA's fraudulent scheme has been pervasive, ongoing, and debilitating
to the conduct of Plaintiff's business.

197.    As the result of JSA's systemic nationwide pattern of racketeering,
customers and the public have relied upon JSA's statements and ceased
using Plaintiff's services.  JSA's acts have had reverberating
consequences for the integrity of Plaintiff's operations beyond those
attributable to the fraudulent acts set forth below.

198.    As a direct and proximate result of Defendants' fraudulent conduct and
statements, in violation of 18 U.S.C. § 1962(c), Frangipani has been,
and continues to be, injured in his business or property in the sum of
Three-Million Dollars ($3,000,000.00), trebled, with costs and attorney's
fees.

### ELEVENTH CAUSE OF ACTION

( ud )

**(Against JSA)**

199.  Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

200.  As set forth above, JSA and/or its representatives, knowingly and fraudulently made numerous false statements to the public and Plaintiff's customers regarding Plaintiff's previous authentications of memorabilia.

201.  As set forth above, JSA and/or its representatives, knowingly and fraudulently asserted they conducted examinations on memorabilia previously authenticated by Frangipani, and that its examination revealed that the items were fake or not authentic.   In fact, JSA did not conduct an examination of the items, but asserted that the items were not authentic only because Frangipani had previously authenticated the items.

202.  As the result of JSA's systemic nationwide pattern of fraud, customers and the public have relied upon JSA's fraudulent claims that it has conducted examinations of memorabilia to determine authenticity of the items, and have paid JSA money for such alleged services.

203.  As the result of JSA's systematic nationwide pattern of fraud, customers and the public have relied upon JSA's fraudulent conclusions regarding the authenticity or lack of authenticity of memorabilia, to their detriment.

204. Plaintiff has been and continues to be injured as the result of JSA's fraudulent statements and acts in a sum to be determined at trial, but not less than Three-Million Dollars ($3,000,000.00).

## TWELFTH CAUSE OF ACTION

### (Gen. Bus. Law § 349)

### (Against JSA)

205. Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

206. JSA made materially deceptive statements when it told the public and customers that it had inspected items previously authenticated by Plaintiff, and had rejected these items as not authentic based upon an actual examination of the item.

207. JSA committed deceptive business practices when it alleged that it was inspecting various items for authenticity, took money for said alleged acts, but in fact did not perform a proper examination that would allow it to determine whether or not an item was authentic.

208. As the result of these materially deceptive statements and practices, JSA led many customers and the public to believe that an item was not authentic, when in fact it was. The result of this practice is that many authentic, valuable, and historic items have been destroyed or have lost their place in history, and the public has been harmed.

209.    JSA's deceptive business practices have caused harm to Plaintiff's business and goodwill and reputation, as well as the public.

210.    As a direct and proximate result of JSA's deceptive business practices under Gen. Bus. Law § 349(a), Plaintiff has and continues to suffer damages from JSA's actions in an amount to be determined at trial, but not less than Three-Million Dollars ($3,000,000.00), plus punitive damages, including Plaintiff's costs of suit and reasonable attorney's fees in bringing this action.

211.    Additionally, JSA should be enjoined from engaging in these deceptive practices.

### THIRTEENTH CAUSE OF ACTION

**Tortious Interference With Business Relations & Prospective Business Relations**

**(Against JSA)**

212.    Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

213.    Prior to June 2005, Plaintiff had business relationships with various collectors and members of the public who relied upon Plaintiff's services to determine the authenticity of sports and other entertainment memorabilia.

214.    JSA was aware of these relationships by virtue of the Frangipani COAs that accompany the memorabilia.

215. When presented with an item with an item of memorabilia accompanied by a COA from Frangipani, JSA would claim to examine the item and determine it was not authentic.  However, JSA was in fact not examining the items, but systematically rejecting the item as not authentic, just because it Frangipani's COA was attached to the item.

216. As the result of this wrongful and fraudulent systematic practice, JSA convinced collectors and members of the public to not utilize Plaintiff's services and to not enter into a business relationship with Plaintiff.

217. But for JSA's actions, these customers of Plaintiff's would have continued to enter into a business relationship with Plaintiff.

218. But for JSA's actions, these collectors and members of the public would have entered into business relationships with Plaintiff.

219. JSA maliciously, knowingly, and intentional interfered with the current and prospective contracts and business of Plaintiff with third parties. Were it not for JSA's improper interference, Plaintiff would have had economic opportunities from which he would have profited.

220. Plaintiff suffered damages from JSA's acts in an amount to be determined at trial, but in no event less than Three-Million Dollars ($3,000,000.00).

## FOURTEENTH CAUSE OF ACTION

**(Libel Per Se)**

**(Against JSA)**

221.    Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

222.    JSA maliciously and willfully injured Plaintiff's good name, reputation and skills as a forensic examiner, impeaching the integrity of Plaintiff's business services.

223.    JSA's automatic rejection of any item previously authenticated by Plaintiff has damaged Plaintiff's business.  JSA's actions give the impression that Plaintiff is dishonest, a swindler and engaged in misrepresentation, fraud and conducting a racket.

224.    JSA's actions and statements have exposed Plaintiff to hatred, contempt and have induced an unsavoury opinion of him in the minds of the sports memorabilia community and the public.

225.    JSA knows that its claims regarding Plaintiff are false, and it has intentionally injured Plaintiff in an effort to capture his business for itself.

226.    Plaintiff's clients and the public no longer employ Plaintiff's authentication services because they know that if the piece is taken to JSA, it will be rejected as a fake, and will become less valuable in the marketplace.

227.    As a direct and proximate result of JSA's statements and actions, Plaintiff has suffered damages and injury in an amount to be determined at trial, but in on event less than Three-Million Dollars ($3,000,000.00) in

damages and punitive damages, and costs of suit, including disbursements.

## FIFTEENTH CAUSE OF ACTION

### (Intentional Falsehood)

### (Against JSA)

228. Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

229. JSA has maliciously circulated, for the purpose of harming Plaintiff and his business, untrue statements about Plaintiff; namely, that it conducted examinations on the sports memorabilia previously authenticated by Frangipani; and that the items were fake. Both of these representations are false.  JSA was not actually conducting examinations that would permit it to determine whether or not an item was genuine, but was automatically rejecting the item because it had been previously authenticated by Plaintiff.    Thus, JSA labeled many genuine items as fake, committing yet another fraud.

230. JSA knew that its actions would harm Plaintiff and his business and injure his reputation.

231. As the result of JSA's statements and actions, Plaintiff has lost many clients.  Customers that had previously utilized Plaintiff's services now refuse to do so.

232.   As a direct and proximate result of JSA's statements and actions, Plaintiff has suffered damages and injury in an amount to be determined at trial, but in no event less than Three-Million Dollars ($3,000,000.00) and punitive damages, and costs of suit, including disbursements.

### SIXTEENTH CAUSE OF ACTION

**(Defamation)**

**(Against JSA)**

233.   Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

234.   JSA has have maliciously circulated, for the purpose of harming Plaintiff and his business, untrue statements about Plaintiff; namely, that it conducted examinations on the sports memorabilia previously authenticated by Frangipani; and that the items were fake. Both of these representations are false.  JSA did not actually conduct examinations that would permit it to determine whether or not an item was genuine, but were automatically rejecting the item because it had been previously authenticated by Plaintiff.    Thus, JSA labeled many genuine items as fake, committing yet another fraud.

235.   JSA knew that its actions would harm Plaintiff and his business and injure his reputation.

236.    As the result of JSA's statements and actions, Plaintiff has lost many
        clients.  Customers that had previously utilized Plaintiff's services now
        refuse to do so.

237.    As a direct and proximate result of JSA's Defendants' statements and
        actions, Plaintiff has suffered damages and injury in an amount to be
        determined at trial, but in no event less than Three-Million Dollars
        ($3,000,000.00) and punitive damages, and costs of suit, including
        disbursements.

### SEVENTEENTH CAUSE OF ACTION

### (CO)

### (Against James Spence)

238.    Plaintiff hereby re-alleges all foregoing paragraphs and incorporates
        them by reference.

239.    James Spence has engaged in a pattern of racketeering by committing
        more than two acts of racketeering activity within the past ten years.
        Each such act of racketeering activity was related, had similar purpose,
        involved the same or similar participants and methods of commission
        and had similar results impacting upon similar victims, including
        Frangipani.

240.    James Spence  is an "enterprise" as that term is defined in 18 U.S.C. §
        1961, engaged in interstate commerce and the activities of which affect
        interstate commerce.  Such activities in and affecting interstate

commerce include, *inter alia*, providing authentication services for autographed memorabilia to individuals, businesses, associations and corporations, who buy and sell autographed memorabilia.

241. Through a pattern of racketeering activity, namely, fraud, James Spence has conducted and participated in an enterprise.

242. With respect to its violations of 18 U.S.C. § 1962(c), James Spence has acted with malice toward Frangipani, and with specific intent to commit the predicate acts alleged herein and to participate in an enterprise.

243. From 2003 to the present, James Spence has performed authentication services of signed memorabilia for the public.

244. When a customer presents an item to James Spence that has been previously authenticated by Frangipani, James Spence claims it has examined the item and found it not to be authentic, when in fact he is automatically rejecting the item just because Frangipani previously authenticated it.

245. The examinations that James Spence has conducted on items previously authenticated by Frangipani are fraudulent, as James Spence is not examining the item as claimed.  He has merely rejected the item as not authentic because Frangipani previously authenticated it.

246. Not only are the alleged examinations fraudulent, the actual opinions issued by James Spence were fraudulent.

247. After rejecting the item solely because Frangipani had previously authenticated it, rather than performing an examination upon the item as claimed, James Spence has sent "rejection letters" in the mail to the customers. These "rejection letters" assert that the item is not real based upon a "thorough examination". In the past six years, James Spence has mailed many such fraudulent rejection letters.

248. Those seeking authentication of memorabilia no longer seek the opinion or services of Plaintiff as they know that if their item has previously been authenticated by Plaintiff, the item will automatically be rejected and declared a fake by James Spence.

249. The fraudulent actions of James Spence have been committed with the intention of influencing the public to no longer utilize Plaintiff's authentication services, thereby eliminating Plaintiff as a competitor and capturing the business for Defendant.

250. James Spence's fraudulent scheme has been pervasive, ongoing, and debilitating to the conduct of Plaintiff's business.

251. As the result of James Spence's systemic nationwide pattern of racketeering, customers and the public have relied upon James Spence's statements and ceased using Plaintiff's services. James Spence's acts have had reverberating consequences for the integrity of Plaintiff's operations beyond those attributable to the fraudulent acts set forth below.

252.   As a direct and proximate result of James Spence's fraudulent conduct and statements, in violation of 18 U.S.C. § 1962(c), Frangipani has been, and continues to be, injured in his business or property in the sum of Three-Million Dollars ($3,000,000.00), trebled, with costs and attorney's fees.

### EIGHTEENTH CAUSE OF ACTION

**(ud )**

**(Against James Spence)**

253.   Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

254.   As set forth above, James Spence and his representatives, knowingly and fraudulently made numerous false statements to the public and Plaintiff's customers regarding Plaintiff's previous authentications of memorabilia.

255.   As set forth above, James Spence and his representatives, knowingly and fraudulently asserted they conducted examinations on memorabilia previously authenticated by Frangipani, and that their examination revealed that the items were fake or not authentic.   In fact, James Spence did not conduct an examination of the items, but asserted that the items were not authentic only because Frangipani had previously authenticated the items.

256.  James Spence's fraudulent schemes have been pervasive, ongoing, and debilitating to the conduct of plaintiff's business.

257.  As the result of James Spence's systemic nationwide pattern of fraud, customers and the public have relied upon James Spence's fraudulent claims that they have conducted examinations of memorabilia to determine authenticity of the items, and have paid Defendants money for such alleged services.

258.  As the result of James Spence's systematic nationwide pattern of fraud, customers and the public have relied upon James Spence's fraudulent conclusions regarding the authenticity or lack of authenticity of memorabilia, to their detriment.

259.  Plaintiff has been and continues to be injured as the result of James Spence's fraudulent statements and acts in a sum to be determined at trial, but not less than Three-Million Dollars ($3,000,000.00).

**NINETEENTH CAUSE OF ACTION**

**(Gen. Bus. Law § 349)**

**(Against James Spence)**

260.  Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

261.  James Spence has made materially deceptive statements when he told the public and customers that he had inspected items previously

authenticated by Plaintiff, and had rejected these items as not authentic based upon an actual examination of the item.

262. James Spence committed deceptive business practices when he alleged that he inspected various items for authenticity, took money for said alleged acts, but in fact did not perform a proper examination that would allow him to determine whether or not an item was authentic.

263. As the result of these materially deceptive statements and practices, James Spence led many customers and the public to believe that an item was not authentic, when in fact it was. The result of this practice is that many authentic, valuable, and historic items have been destroyed or have lost their place in history, and the public has been harmed.

264. James Spence's deceptive business practices have caused harm to Plaintiff's business and goodwill and reputation, as well as the public.

265. As a direct and proximate result of James Spence's deceptive business practices under Gen. Bus. Law § 349(a), Plaintiff has and continues to suffer damages from Defendants' actions in an amount to be determined at trial, but not less than Three-Million Dollars ($3,000,000.00), plus punitive damages, including Plaintiff's costs of suit and reasonable attorney's fees in bringing this action.

266. Additionally, Defendant should be enjoined from engaging in these deceptive practices.

**TWENTIETH CAUSE OF ACTION**

### Tortious Interference With Business Relations & Prospective Business Relations

### (Against James Spence)

267. Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

268. Prior to June 2005, Plaintiff had business relationships with various collectors and members of the public who relied upon Plaintiff's services to determine the authenticity of sports and other entertainment memorabilia.

269. James Spence was aware of these relationships by virtue of the Frangipani COAs that accompany the memorabilia.

270. When presented with an item with an item of memorabilia accompanied by a COA from Frangipani, James Spence would claim to examine the item and determine it was not authentic. However, James Spence was in fact not examining the items, but systematically rejecting the item as not authentic, just because it Frangipani's COA was attached to the item.

271. As the result of this wrongful and fraudulent systematic practice, James Spence convinced collectors and members of the public to not utilize Plaintiff's services and to not enter into a business relationship with Plaintiff.

272. But for James Spence's actions, these customers of Plaintiff's would have continued to enter into a business relationship with Plaintiff.

273.  But for James Spence's actions, these collectors and members of the public would have entered into business relationships with Plaintiff.

274.  James Spence maliciously, knowingly, and intentional interfered with the current and prospective contracts and business of Plaintiff with third parties.  Were it not for James Spence's improper interference, Plaintiff would have had economic opportunities from which he would have profited.

275.  Plaintiff suffered damages from James Spence's acts in an amount to be determined at trial, but in no event less than Three-Million Dollars ($3,000,000.00).

## TWENTY-FIRST CAUSE OF ACTION

### (Libel Per Se)

### (Against James Spence)

276.  Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

277.  James Spence maliciously and willfully injured Plaintiff's good name, reputation and skills as a forensic examiner, impeaching the integrity of Plaintiff's business services.

278.  James Spence's automatic rejection of any item previously authenticated by Plaintiff has damaged Plaintiff's business.  James Spence's actions give the impression that Plaintiff is dishonest, a swindler and engaged in misrepresentation, fraud and conducting a racket.

279.  James Spence's actions and statements have exposed Plaintiff to
      hatred, contempt and have induced an unsavoury opinion of him in the
      minds of the sports memorabilia community and the public.

280.  James Spence knew that his claims regarding Plaintiff are false, and
      they have intentionally injured Plaintiff in an effort to capture his business
      for himself.

281.   Plaintiff's clients and the public no longer employ Plaintiff's
      authentication services because they know that if the piece is taken to
      James Spence, it will be rejected as a fake, and will become less
      valuable in the marketplace.

282.  As a direct and proximate result of James Spence's statements and
      actions, Plaintiff has suffered damages and injury in an amount to be
      determined at trial, but in on event less than Three-Million Dollars
      ($3,000,000.00) in damages and punitive damages, and costs of suit,
      including disbursements.

**<u>TWENTY-SECOND CAUSE OF ACTION</u>**

**(Intentional Falsehood)**

**(Against James Spence)**

283.  Plaintiff hereby re-alleges all foregoing paragraphs and incorporates
      them by reference.

284.  James Spence has maliciously circulated, for the purpose of harming
      Plaintiff and his business, untrue statements about Plaintiff; namely, that

he has conducted examinations on the sports memorabilia previously authenticated by Frangipani; and that the items were fake. Both of these representations are false. James Spence was not actually conducting examinations that would permit him to determine whether or not an item was genuine, but was automatically rejecting the item because it had been previously authenticated by Plaintiff. Thus, James Spence were labeling many genuine items as fake, committing yet another fraud.

285. James Spence knew that his actions would harm Plaintiff and his business and injure his reputation.

286. As the result of James Spence's statements and actions, Plaintiff has lost many clients. Customers that had previously utilized Plaintiff's services now refuse to do so.

287. As a direct and proximate result of James Spence's statements and actions, Plaintiff has suffered damages and injury in an amount to be determined at trial, but in no event less than Three-Million Dollars ($3,000,000.00) and punitive damages, and costs of suit, including disbursements.

## TWENTY-THIRD CAUSE OF ACTION

### (Defamation)

### (Against James Spence)

288. Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

289.   James Spence has maliciously circulated, for the purpose of harming
       Plaintiff and his business, untrue statements about Plaintiff; namely, that
       he conducted examinations on the sports memorabilia previously
       authenticated by Frangipani; and that the items were fake. Both of these
       representations are false.  James Spence was not actually conducting
       examinations that would permit him to determine whether or not an item
       was genuine, but was automatically rejecting the item because it had
       been previously authenticated by Plaintiff.    Thus, James Spence was
       labeling many genuine items as fake, committing yet another fraud.

290.   James Spence knew that his actions would harm Plaintiff and his
       business and injure his reputation.

291.   As the result of James Spence's statements and actions, Plaintiff has
       lost many clients.  Customers that had previously utilized Plaintiff's
       services now refuse to do so.

292.   As a direct and proximate result of James Spence's statements and
       actions, Plaintiff has suffered damages and injury in an amount to be
       determined at trial, but in no event less than Three-Million Dollars
       ($3,000,000.00) and punitive damages, and costs of suit, including
       disbursements.


### TWENTY-FOURTH CAUSE OF ACTION

(RICO)

**(Against RSS)**

293. Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

294. RSS has engaged in a pattern of racketeering by committing more than two acts of racketeering activity within the past ten years.  Each such act of racketeering activity was related, had similar purpose, involved the same or similar participants and methods of commission and had similar results impacting upon similar victims, including Frangipani.

295. Section 1962(c) of RICO provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

296. RSS  is an "enterprise" as that term is defined in 18 U.S.C. § 1961, engaged in interstate commerce and the activities of which affect interstate commerce.  Such activities in and affecting interstate commerce include, *inter alia*, providing authentication services for autographed memorabilia to individuals, businesses, associations and corporations, who buy and sell autographed memorabilia.

297. Through a pattern of racketeering activity, namely, fraud, RSS has conducted and participated in the affairs of RSS as an enterprise.

298.  With respect to its violations of 18 U.S.C. § 1962(c), RSS has acted with malice toward Frangipani, and with specific intent to commit the predicate acts alleged herein and to participate in the RSS Enterprise.

299.  From 2003 to the present, RSS advertises and informs the public that it will examine signed memorabilia to determine if the item is authentic.

300.  When a customer presents an item to RSS that has been previously authenticated by Frangipani, RSS claims it has examined the item and found it not to be authentic, when in fact it is automatically rejecting the item just because Frangipani previously authenticated it.

301.  The examinations that RSS conducts on items previously authenticated by Frangipani are fraudulent as RSS is not examining the item as claimed.  It is merely rejecting the item as not authentic because Frangipani previously authenticated it.

302.  Not only are the alleged examinations fraudulent, the actual opinions issued by RSS are fraudulent.

303.  After rejecting the item solely because Frangipani had previously authenticated it, rather than performing an examination upon the item as claimed, RSS sends "rejection letters" in the mail to the customers. These "rejection letters" assert that the item is not real based upon a "thorough examination".  In the past six years, RSS has mailed hundreds, if not thousands of such fraudulent rejection letters.

304.  Those seeking authentication of memorabilia no longer seek the opinion or services of Plaintiff as they know that if their item has previously been authenticated by Plaintiff, the item will automatically be rejected and declared a fake by RSS.

305.  The fraudulent actions of RSS have been committed with the intention of influencing the public to no longer utilize Plaintiff's authentication services, thereby eliminating Plaintiff as a competitor and capturing the business for Defendant.

306.  RSS's fraudulent scheme has been pervasive, ongoing, and debilitating to the conduct of Plaintiff's business.

307.  As the result of RSS's systemic nationwide pattern of racketeering, customers and the public have relied upon RSS's statements and have ceased using Plaintiff's services. RSS's acts have had reverberating consequences for the integrity of Plaintiff's operations beyond those attributable to the fraudulent acts set forth below.

308.  As a direct and proximate result of Defendant's fraudulent conduct and statements, in violation of 18 U.S.C. § 1962(c), Frangipani has been, and continues to be, injured in his business or property in the sum of Two-Million Dollars ($2,000,000.00), trebled, with costs and attorney's fees.

## **TWENTY-FIFTH CAUSE OF ACTION**

### **(Antitrust and Unfair Competition, 15 U.S.C. § 1)**

**(Against RSS)**

309.  Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

310.  RSS has conspired with others to eliminate competition from Plaintiff in the signature authentication industry nationwide.

311.  The actions of RSS and others have had an adverse anticompetitive effect upon trade in the authentication industry.

312.  As the direct result of the anticompetitive actions of RSS in concert with others, Plaintiff's business has been adversely affected.

313.  Plaintiff has been and continues to be injured as the result of RSS's actions in a sum to be determined at trial, but not less than Two-Million Dollars ($2,000,000), trebled, plus attorneys' fees and costs of suit including disbursements.

## TWENTY-SIXTH CAUSE OF ACTION

**(ud )**

**(Against RSS)**

314.  Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

315.  As set forth above, RSS and/or its representatives, knowingly and fraudulently made numerous false statements to the public and Plaintiff's customers regarding Plaintiff's previous authentications of memorabilia.

316. As set forth above, RSS and/or its representatives, knowingly and fraudulently asserted they conducted examinations on memorabilia previously authenticated by Frangipani, and that their examination revealed that the items were fake or not authentic.   In fact, RSS did not conduct an examination of the items, but asserted that the items were not authentic only because Frangipani had previously authenticated the items.

317. RSS's fraudulent schemes have been pervasive, ongoing, and debilitating to the conduct of Plaintiff's business.

318. As the result of RSS's systemic nationwide pattern of fraud, customers and the public have relied upon RSS's fraudulent claims that it has conducted examinations of memorabilia to determine the authenticity of the items, and have paid RSS money for such alleged services.

319. As the result of RSS's systematic nationwide pattern of fraud, customers and the public have relied upon RSS's fraudulent conclusions regarding the authenticity or lack of authenticity of memorabilia, to their detriment.

320. Plaintiff has been and continues to be injured as the result of RSS's fraudulent statements and acts in a sum to be determined at trial, but not less than Two-Million Dollars ($2,000,000.00).

## TWENTY-SEVENTH CAUSE OF ACTION

### (Gen. Bus. Law § 349)

### (Against RSS)

321. Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

322. RSS made materially deceptive statements when it told the public and customers that it had inspected items previously authenticated by Plaintiff, and had rejected these items as not authentic based upon an actual examination of the item.

323. RSS committed deceptive business practices when it alleged that it was inspecting various items for authenticity, took money for said alleged acts, but in fact did not perform a proper examination that would allow it to determine whether or not an item was authentic.

324. As the result of these materially deceptive statements and practices, RSS led many customers and the public to believe that an item was not authentic, when in fact it was. The result of this practice is that many authentic, valuable, and historic items have been destroyed or have lost their place in history, and the public has been harmed.

325. RSS's deceptive business practices have caused harm to Plaintiff's business and goodwill and reputation, as well as to the public.

326. As a direct and proximate result of RSS's deceptive business practices under Gen. Bus. Law § 349(a), Plaintiff has and continues to suffer damages from Defendant's actions in an amount to be determined at trial, but not less than Two-Million Dollars ($2,000,000.00), plus punitive

damages, including Plaintiff's costs of suit and reasonable attorney's fees in bringing this action

327. Additionally, Defendant should be enjoined from engaging in these deceptive practices.

### TWENTY-EIGHTH CAUSE OF ACTION

**Tortious Interference With Business Relations &
Prospective Business Relations**

**(Against RSS)**

328. Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

329. Prior to June 2005, Plaintiff had business relationships with various collectors and members of the public who relied upon Plaintiff's services to determine the authenticity of sports and other entertainment memorabilia.

330. RSS was aware of these relationships by virtue of the Frangipani COAs that accompany the memorabilia.

331. When presented with an item with an item of memorabilia accompanied by a COA from Frangipani, RSS would claim to examine the item and determine it was not authentic. However, RSS was in fact not examining the items, but systematically rejecting the item as not authentic, just because it Frangipani's COA was attached to the item.

332.  As the result of this wrongful and fraudulent systematic practice, RSS convinced collectors and members of the public to not utilize Plaintiff's services and to not enter into a business relationship with Plaintiff.

333.  For the past year, the RSS further interfered with Plaintiff's business by publishing two defamatory statements about Plaintiff on its website.

334.  RSS's website states that on the HBO segment previously referred to, F.B.I. agent "showed the reporter a large box of COA's which came from forensic authenticator Donald Frangipani."  This statement was false at the time it was made, as the COAs were forgeries made by the forgery ring, and were not provided by Frangipani.

335.  The website states that Frangipani was the "the authenticator of choice" for the forgery ring.  This statement was false at the time it was made.

336.  But for RSS's actions, these customers of Plaintiff's would have continued to enter into a business relationship with Plaintiff.

337.  But for RSS's actions, these collectors and members of the public would have entered into business relationships with Plaintiff.

338.  Defendants maliciously, knowingly, and intentional interfered with the current and prospective contracts and business of Plaintiff with third parties.  Were it not for RSS's improper interference, Plaintiff would have had economic opportunities from which he would have profited.

339.    Plaintiff suffered damages from RSS's acts in an amount to be
determined at trial, but in no event less than Two-Million Dollars
($2,000,000.00).

## TWENTY-NINTH CAUSE OF ACTION

### (Libel Per Se)

### (Against RSS)

340.    Plaintiff hereby re-alleges all foregoing paragraphs and incorporates
them by reference.

341.    RSS maliciously and willfully injured Plaintiff's good name, reputation
and skills as a forensic examiner, impeaching the integrity of Plaintiff's
business services.

342.    RSS's automatic rejection of any item previously authenticated by
Plaintiff has damaged Plaintiff's business.  RSS's actions give the
impression that Plaintiff is dishonest, a swindler and engaged in
misrepresentation, fraud and conducting a racket.

343.    RSS's actions and statements have exposed Plaintiff to hatred,
contempt and have induced an unsavoury opinion of him in the minds of
the sports memorabilia community and the public.

344.    RSS knew that its claims regarding Plaintiff are false, and it has
intentionally injured Plaintiff in an effort to capture his business for itself.

345.     Plaintiff's clients and the public no longer employ Plaintiff's
authentication services because they know that if the piece is taken to

RSS, it will be rejected as a fake, and will become less valuable in the
marketplace.

346. As a direct and proximate result of RSS's statements and actions,
Plaintiff has suffered damages and injury in an amount to be determined
at trial, but in no event less than Two-Million Dollars ($2,000,000.00) in
damages and punitive damages, and costs of suit, including
disbursements.

## THIRTIETH CAUSE OF ACTION

### (Intentional Falsehood)

### (Against RSS)

347. Plaintiff hereby re-alleges all foregoing paragraphs and incorporates
them by reference.

348. RSS has maliciously circulated, for the purpose of harming Plaintiff and
his business, untrue statements about Plaintiff; namely, that they
conducted examinations on the sports memorabilia previously
authenticated by Frangipani; and that the items were fake. Both of these
representations are false.  RSS was not actually conducting
examinations that would permit it to determine whether or not an item
was genuine, but was automatically rejecting the item because it had
been previously authenticated by Plaintiff.    Thus, RSS was labeling
many genuine items as fake, committing yet another fraud.

349. RSS has placed defamatory statements about Plaintiff on their website.

350.  RSS knew that their actions would harm Plaintiff and his business and injure his reputation.

351.  As the result of RSS's statements and actions, Plaintiff has lost many clients.  Customers that had previously utilized Plaintiff's services now refuse to do so.

352.  As a direct and proximate result of RSS's statements and actions, Plaintiff has suffered damages and injury in an amount to be determined at trial, but in no event less than Two-Million Dollars ($2,000,000.00) and punitive damages, plus costs of suit, including disbursements.

## THIRTY-FIRST CAUSE OF ACTION

### (Defamation)

### (Against RSS)

353.  Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

354.  RSS has maliciously circulated, for the purpose of harming Plaintiff and his business, false statements about Plaintiff; namely, that it conducted examinations on the sports memorabilia previously authenticated by Frangipani; and that the items were fake. Both of these representations are false.  RSS was not actually conducting examinations that would permit them to determine whether or not an item was genuine, but was automatically rejecting the item because it had been previously

authenticated by Plaintiff.    Thus, RSS was labeling many genuine items

as fake, committing yet another fraud.

355.    RSS has maliciously placed defamatory statements about Plaintiff on its

website, which were false at the time they were made.

356.    RSS knew that its actions would harm Plaintiff and his business and

injure his reputation.

357.    As the result of RSS's statements and actions, Plaintiff has lost many

clients.  Customers that had previously utilized Plaintiff's services now

refuse to do so.

358.    As a direct and proximate result of RSS's statements and actions,

Plaintiff has suffered damages and injury in an amount to be determined

at trial, but in no event less than Two-Million Dollars ($2,000,000.00) and

punitive damages, plus costs of suit, including disbursements.

## THIRTY-SECOND CAUSE OF ACTION

### (CO)

### (Against Richard Simon)

359.    Plaintiff hereby re-alleges all foregoing paragraphs and incorporates

them by reference.

360.    Richard Simon has engaged in a pattern of racketeering by committing

more than two acts of racketeering activity within the past ten years.

Each such act of racketeering activity was related, had similar purpose,

involved the same or similar participants and methods of commission

and had similar results impacting upon similar victims, including Frangipani.

361.　Through a pattern of racketeering activity, namely, fraud, Richard Simon has conducted and participated an enterprise.

362.　With respect to violations of 18 U.S.C. § 1962(c), Richard Simon has acted with malice toward Frangipani, and with specific intent to commit the predicate acts alleged herein and to participate in an enterprise.

363.　From 2003 to the present, Richard Simon has advertised and informed the public that he will examine signed memorabilia to determine if the item is authentic.

364.　When a customer presents an item to Richard Simon that has been previously authenticated by Frangipani, PSA, he claims he has examined the item and found it not to be authentic, when in fact he is automatically rejecting the item just because Frangipani previously authenticated it.

365.　The examinations that Richard Simon conducts on items previously authenticated by Frangipani are fraudulent, as Richard Simon is not examining the item as claimed.  He is merely rejecting the item as not authentic because Frangipani previously authenticated it.

366.　Not only are the alleged examinations fraudulent, the actual opinions issued by Richard Simon are fraudulent.

367. After rejecting the item solely because Frangipani had previously authenticated it, rather than performing an examination upon the item as claimed, Richard Simon sends "rejection letters" in the mail to the customers. These "rejection letters" assert that the item is not real based upon a "thorough examination."

368. Those seeking authentication of memorabilia no longer seek the opinion or services of Plaintiff as they know that if their item has previously been authenticated by Plaintiff, the item will automatically be rejected and declared a fake by Richard Simon.

369. The fraudulent actions of Richard Simon have been committed with the intention of influencing the public to no longer utilize Plaintiff's authentication services, thereby eliminating Plaintiff as a competitor and capturing the business for himself.

370. Richard Simon's fraudulent scheme has been pervasive, ongoing, and debilitating to the conduct of Plaintiff's business.

371. As the result of Richard Simon's systemic nationwide pattern of racketeering, customers and the public have relied upon Defendant's statements and ceased using Plaintiff's services. Defendant's acts have had reverberating consequences for the integrity of Plaintiff's operations beyond those attributable to the fraudulent acts set forth below.

372. As a direct and proximate result of Defendant's fraudulent conduct and statements, in violation of 18 U.S.C. § 1962(c), Frangipani has been,

and continues to be, injured in his business or property in the sum of Two-Million Dollars ($2,000,000.00), trebled, with costs and attorney's fees.

### THIRTY-THIRD CAUSE OF ACTION

**(Antitrust d Unfair Competition, 15 U.S.C. § 1)**

**(Against Richard Simon)**

373. Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

374. Richard Simon has conspired with others to eliminate competition from Plaintiff in the signature authentication industry nationwide.

375. The actions of Richard Simon and others have had an adverse anticompetitive effect upon trade in the authentication industry.

376. As the direct result of the anticompetitive actions of Richard Simon, Plaintiff's business has been adversely affected.

377. Plaintiff has been and continues to be injured as the result of Defendant's actions in a sum to be determined at trial, but not less than Two-Million Dollars ($2,000,000), trebled, plus attorneys' fees and costs of suit including disbursements.

### THIRTY-FOURTH CAUSE OF ACTION

**(ud )**

**(Against Richard Simon)**

378.  Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

379.  As set forth above, Richard Simon and/or his representatives, knowingly and fraudulently made numerous false statements to the public and Plaintiff's customers regarding Plaintiff's previous authentications of memorabilia.

380.  As set forth above, Richard Simon and/or his representatives, knowingly and fraudulently asserted they conducted examinations on memorabilia previously authenticated by Frangipani, and that their examination revealed that the items were fake or not authentic.   In fact, Richard Simon did not conduct an examination of the items, but asserted that the items were not authentic only because Frangipani had previously authenticated the items.

381.  Richard Simon's fraudulent schemes have been pervasive, ongoing, and debilitating to the conduct of plaintiff's business.

382.  As the result of Richard Simon's systemic nationwide pattern of fraud, customers and the public have relied upon Richard Simon's fraudulent claims that he has conducted examinations of memorabilia to determine authenticity of the items, and have paid Richard Simon money for such alleged services.

383.  As the result of Richard Simon's systematic nationwide pattern of fraud, customers and the public have relied upon his fraudulent conclusions

regarding the authenticity or lack of authenticity of memorabilia, to their detriment.

384.   Plaintiff has been and continues to be injured as the result of Richard Simon's fraudulent statements and acts in a sum to be determined at trial, but not less than Two-Million Dollars ($2,000,000.00).

## THIRTY-FIFTH CAUSE OF ACTION

### (Gen. Bus. Law § 349)

### (Against Richard Simon)

385.   Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

386.   Richard Simon made materially deceptive statements when he told the public and customers that he inspected items previously authenticated by Plaintiff, and rejected these items as not authentic based upon an actual examination of the item.

387.   Richard Simon committed deceptive business practices when he alleged that he was inspecting various items for authenticity, took money for said alleged acts, but in fact did not perform a proper examination that would allow him to determine whether or not an item was authentic.

388.   As the result of these materially deceptive statements and practices, Richard Simon led many customers and the public to believe that an item was not authentic, when in fact it was.  The result of this practice is

that many authentic, valuable, and historic items have been destroyed or have lost their place in history, and the public has been harmed.

389.  Defendant's deceptive business practices have caused harm to Plaintiff's business and goodwill and reputation, as well as the public.

390.  As a direct and proximate result of Defendant's deceptive business practices under Gen. Bus. Law § 349(a), Plaintiff has and continues to suffer damages from Defendants' actions in an amount to be determined at trial, but not less than Two-Million Dollars ($2,000,000.00), plus punitive damages, including Plaintiff's costs of suit and reasonable attorney's fees in bringing this action.

391.  Additionally, Defendant should be enjoined from engaging in these deceptive practices.

## THIRTY-SIXTH CAUSE OF ACTION

### Tortious Interference With Business Relations & Prospective Business ▤ations

### (Against Richard Simon)

392.  Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

393.  Prior to June 2005, Plaintiff had business relationships with various collectors and members of the public who relied upon Plaintiff's services to determine the authenticity of sports and other entertainment memorabilia.

394. Richard Simon was aware of these relationships by virtue of the Frangipani COAs that accompany the memorabilia.

395. When presented with an item with an item of memorabilia accompanied by a COA from Frangipani, Richard Simon would claim to examine the item and determine it was not authentic. However, Richard Simon was in fact not examining the items, but systematically rejecting the item as not authentic, just because it Frangipani's COA was attached to the item.

396. As the result of this wrongful and fraudulent systematic practice, Defendant convinced collectors and members of the public to not utilize Plaintiff's services and to not enter into a business relationship with Plaintiff.

397. For the past year, Richard Simon has further interfered with Plaintiff's business by publishing two defamatory statements about Plaintiff on the internet.

398. A website maintained by Richard Simon states that on the HBO segment previously referred to, F.B.I. agent "showed the reporter a large box of COA's which came from forensic authenticator Donald Frangipani." This statement was false at the time it was made, as the COAs were forgeries made by the forgery ring, and were not provided by Frangipani.

399. The website states that Frangipani was the "the authenticator of choice" for the forgery ring. This statement was false at the time it was made.

400.  But for Richard Simon's actions, these customers of Plaintiff's would have continued to enter into a business relationship with Plaintiff.

401.  But for Richard Simon's actions, these collectors and members of the public would have entered into business relationships with Plaintiff.

402.  Richard Simon maliciously, knowingly, and intentional interfered with the current and prospective contracts and business of Plaintiff with third parties.  Were it not for Richard Simon's improper interference, Plaintiff would have had economic opportunities from which he would have profited.

403.  Plaintiff suffered damages from Defendants' acts in an amount to be determined at trial, but in no event less than Two-Million Dollars ($2,000,000.00).

## THIRTY-SEVENTH CAUSE OF ACTION

### (Libel Per Se)

### (Against Richard Simon)

404.  Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

405.  Richard Simon maliciously and willfully injured Plaintiff's good name, reputation and skills as a forensic examiner, impeaching the integrity of Plaintiff's business services.

406.  Richard Simon's automatic rejection of any item previously authenticated by Plaintiff has damaged Plaintiff's business.  Defendant's actions give

the impression that Plaintiff is dishonest, a swindler and engaged in misrepresentation, fraud and conducting a racket.

407. Richard Simon's actions and statements have exposed Plaintiff to hatred, contempt and have induced an unsavoury opinion of him in the minds of the sports memorabilia community and the public.

408. Richard Simon knew that his claims regarding Plaintiff are false, and he has intentionally injured Plaintiff in an effort to capture his business for himself.

409.  Plaintiff's clients and the public no longer employ Plaintiff's authentication services because they know that if the piece is taken to Richard Simon, it will be rejected as a fake, and will become less valuable in the marketplace.

410. As a direct and proximate result of Defendant's statements and actions, Plaintiff has suffered damages and injury in an amount to be determined at trial, but in on event less than Two-Million Dollars ($2,000,000.00) in damages and punitive damages, plus costs of suit, including disbursements.

## THIRTY-EIGHTH CAUSE OF ACTION

### (Intentional Falsehood)

### (Against Richard Simon)

411. Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

412.  Richard Simon has maliciously circulated, for the purpose of harming Plaintiff and his business, untrue statements about Plaintiff; namely, that he has conducted examinations on the sports memorabilia previously authenticated by Frangipani; and that the items were fake. Both of these representations are false.  Richard Simon did  not actually conduct examinations that would permit him to determine whether or not an item was genuine, but was automatically rejecting the item because it had been previously authenticated by Plaintiff.    Thus, Defendant labeled many genuine items as fake, committing yet another fraud.

413.  Richard Simon has maliciously placed defamatory statements about Plaintiff a website he maintains.

414.  Richard Simon knew that his actions would harm Plaintiff and his business and injure his reputation.

415.  As the result of Defendant's statements and actions, Plaintiff has lost many clients.  Customers that had previously utilized Plaintiff's services now refuse to do so.

416.  As a direct and proximate result of Defendants' statements and actions, Plaintiff has suffered damages and injury in an amount to be determined at trial, but in no event less than Two-Million Dollars ($2,000,000.00) and punitive damages, plus costs of suit, including disbursements.

## THIRTY-NINTH CAUSE OF ACTION

### (Defamation)

**(Against Richard Simon)**

417.  Plaintiff hereby re-alleges all foregoing paragraphs and incorporates them by reference.

418.  Richard Simon has maliciously circulated, for the purpose of harming Plaintiff and his business, untrue statements about Plaintiff; namely, that he conducted examinations on the sports memorabilia previously authenticated by Frangipani; and that the items were fake. Both of these representations are false.  Defendant did not actually conduct examinations that would permit him to determine whether or not an item was genuine, but automatically rejected the item because it had been previously authenticated by Plaintiff.    Thus, Richard Simon labeled many genuine items as fake, committing yet another fraud.

419.  For the past year, Richard Simon has maliciously published defamatory statements about Plaintiff on their website; namely, that Frangipani was the authenticator of choice for a forgery ring and that a large box of COAs for forged items, shown on the HBO segment, were provided by Frangipani.

420.  These statements were false at the time they were made.

421.  Defendant's defamatory statements have caused harm to Plaintiff's business.

422.  As the result of Defendant's statements and actions, Plaintiff has been subjected to public disgrace and humiliation and has had his reputation ruined.

423.  As a direct and proximate result of Defendants' statements and actions, Plaintiff has suffered damages and injury in an amount to be determined at trial, but in no event less than Two-Million Dollars ($2,000,000.00) and punitive damages, plus costs of suit, including disbursements.

**WHEREFORE**, Plaintiff **DONALD FRANGIPANI** demands judgment as follows:

(a)  On the First Cause of Action of Defamation, jointly and severally against the HBO Defendants, for damages in an amount to be determined at trial, but not less than Five-Million Dollars ($5,000,000.00), and punitive damages, plus the cost of this suit including disbursements;

(b)  On the Second Cause of Action of a violation of RICO against Collectors and PSA, for damages in an amount to be determined at trial, but not less than Three-Million Dollars ($3,000,000.00), trebled, attorneys fees and costs of suit;

(c)  On the Third Cause of Action for Anti-Trust and Unfair Competition violations against Collectors, PSA, JSA, and James Spence, for damages in an amount to be determined at trial, but in any event not less than Five-Million Dollars ($5,000,000.00),

trebled, plus attorneys fees and costs of suit, including

disbursements;

(d)    On the Fourth Cause of Action for violations of Fraud against

Collectors and PSA, for damages to be determined at trial, but

not less than Three-Million Dollars ($3,000,000.00);

(e)    On the Fifth Cause of Action for violations of Gen. Bus. Law §

349 against Collectors and PSA, for damages in an amount to

be determined at trial, but in any event not less than Three-

Million Dollars ($3,000,000.00), and punitive damages, plus

attorney's fees and costs of suit and enjoining Defendants from

such deceptive business practices;

(f)    On the Sixth Fifth Cause of Action against Collectors and PSA,

for Tortious Interference With Prospective Business Relations,

for damages in an amount to be determined at trial, but not less

than Three-Million Dollars ($3,000,000.00);

(g)    On the Seventh Cause of Action of Libel Per Se against

Collectors and PSA, for damages to be proved at trial, but in no

event less than Three-Million Dollars ($3,000,000.00) in

damages and punitive damages, plus the cost of this suit

including disbursements;

(h)    On the Eighth Cause of Action of Intentional Falsehood against

Collectors and PSA, for damages in an amount to be

determined at trial, but not less than Three-Million Dollars ($3,000,000) and punitive damages, plus the cost of this suit including disbursements;

(i)     On the Ninth Cause of Action of Defamation against Collectors and PSA, for damages in an amount to be determined at trial, but not less than Three-Million Dollars ($3,000,000.00) in damages, and punitive damages, plus costs of this suit including disbursements;

(j)     On the Tenth Cause of Action for a violation of RICO against JSA, for damages in an amount to be determined at trial, but not less than Three-Million Dollars ($3,000,000.00), trebled, attorneys fees and costs of suit;

(k)     On the Eleventh Cause of Action for violations of Fraud against JSA, for damages to be determined at trial, but not less than Three-Million Dollars ($3,000,000.00);

(l)     On the Twelfth Cause of Action for violations of Gen. Bus. Law § 349 against JSA, for damages in an amount to be determined at trial, but in any event not less than Three-Million Dollars ($3,000,000.00), and punitive damages, plus attorney's fees and costs of suit and enjoining Defendants from such deceptive business practices;

(m)    On the Thirteenth Cause of Action against JSA for Tortious

Interference With Prospective Business Relations,  for damages

in an amount to be determined at trial, but not less than Three-

Million Dollars ($3,000,000.00);

(n)    On the Fourteenth Cause of Action of Libel Per Se against JSA,

for damages to be proved at trial, but in no event less than

Three-Million Dollars ($3,000,000.00) in damages and punitive

damages, plus the cost of this suit including disbursements;

(o)    On the Fifteenth Cause of Action of Intentional Falsehood

against JSA, for damages in an amount to be determined at

trial, but not less than Three-Million Dollars ($3,000,000) and

punitive damages, plus the cost of this suit including

disbursements;

(p)    On the Sixteenth Cause of Action of Defamation against JSA,

for damages in an amount to be determined at trial, but not less

than Three-Million Dollars ($3,000,000.00) in damages, and

punitive damages, plus costs of this suit including

disbursements;

(q)    On the Seventeenth Cause of Action for a violation of RICO

against James Spence, for damages in an amount to be

determined at trial, but not less than Three-Million Dollars

($3,000,000.00), trebled, attorneys fees and costs of suit;

(r)     On the Eighteenth Cause of Action for violations of Fraud against James Spence, for damages to be determined at trial, but not less than Three-Million Dollars ($3,000,000.00);

(s)     On the Nineteenth Cause of Action for violations of Gen. Bus. Law § 349 against James Spence, for damages in an amount to be determined at trial, but in any event not less than Three-Million Dollars ($3,000,000.00), and punitive damages, plus attorney's fees and costs of suit and enjoining Defendant from such deceptive business practices;

(t)     On the Twentieth Cause of Action against James Spence for Tortious Interference With Prospective Business Relations,  for damages in an amount to be determined at trial, but not less than Three-Million Dollars ($3,000,000.00);

(u)     On the Twenty-First Cause of Action of Libel Per Se against James Spence, for damages to be proved at trial, but in no event less than Three-Million Dollars ($3,000,000.00) in damages and punitive damages, plus the cost of this suit including disbursements;

(v)     On the Twenty-Second Cause of Action of Intentional Falsehood against James Spence, for damages in an amount to be determined at trial, but not less than Three-Million Dollars

($3,000,000) and punitive damages, plus the cost of this suit including disbursements;

(w)   On the Twenty-Third Cause of Action of Defamation against James Spence, for damages in an amount to be determined at trial, but not less than Three-Million Dollars ($3,000,000.00) in damages, and punitive damages, plus costs of this suit including disbursements;

(x)   On the Twenty-Fourth Cause of Action for a violation of RICO against RSS, for damages in an amount to be determined at trial, but not less than Two-Million Dollars ($2,000,000.00), trebled, attorneys fees and costs of suit;

(y)   On the Twenty-Fifth Cause of Action for Anti-Trust and Unfair Competition violations against RSS, for damages in an amount to be determined at trial, but in any event not less than Two-Million Dollars ($2,000,000.00), trebled, plus attorneys fees and costs of suit, including disbursements;

(z)   On the Twenty-Sixth Cause of Action for Fraud against RSS, for damages to be determined at trial, but not less than Two-Million Dollars ($2,000,000.00);

(aa)  On the Twenty-Seventh Cause of Action for violations of Gen. Bus. Law § 349 against RSS, for damages in an amount to be determined at trial, but in any event not less than Two-Million

Dollars ($2,000,000.00), and punitive damages, plus attorney's

fees and costs of suit and enjoining Defendants from such

deceptive business practices;

(bb)   On the Twenty-Eighth Cause of Action against RSS for Tortious

Interference With Prospective Business Relations,  for damages

in an amount to be determined at trial, but not less than Two-

Million Dollars ($2,000,000.00);

(cc)   On the Twenty-Ninth Cause of Action of Libel Per Se against

RSS, for damages to be proved at trial, but in no event less than

Two-Million Dollars ($2,000,000.00) in damages and punitive

damages, plus the cost of this suit including disbursements;

(dd)   On the Thirtieth Cause of Action of Intentional Falsehood

against RSS, for damages in an amount to be determined at

trial, but not less than Two-Million Dollars ($2,000,000) and

punitive damages, plus the cost of this suit including

disbursements;

(ee)   On the Thirty-First Cause of Action of Defamation against RSS,

for damages in an amount to be determined at trial, but not less

than Two-Million Dollars ($2,000,000.00) in damages, and

punitive damages, plus costs of this suit including

disbursements;

(ff)    On the Thirty-Second Cause of Action for a violation of RICO against Richard Simon, for damages in an amount to be determined at trial, but not less than Two-Million Dollars ($2,000,000.00), trebled, attorneys fees and costs of suit;

(gg)    On the Thirty-Third Cause of Action for Anti-Trust and Unfair Competition violations against Richard Simon, for damages in an amount to be determined at trial, but in any event not less than Two-Million Dollars ($2,000,000.00), trebled, plus attorneys fees and costs of suit, including disbursements;

(hh)    On the Thirty-Fourth Cause of Action for Fraud against Richard Simon, for damages to be determined at trial, but not less than Two-Million Dollars ($2,000,000.00);

(ii)    On the Thirty-Fifth Cause of Action for violations of Gen. Bus. Law § 349 against RSS, for damages in an amount to be determined at trial, but in any event not less than Two-Million Dollars ($2,000,000.00), and punitive damages, plus attorney's fees and costs of suit and enjoining Defendant from such deceptive business practices;

(jj)    On the Thirty-Sixth Cause of Action against Richard Simon for Tortious Interference With Prospective Business Relations,  for damages in an amount to be determined at trial, but not less than Two-Million Dollars ($2,000,000.00);

(kk)    On the Thirty-Seventh Cause of Action of Libel Per Se against Richard Simon, for damages to be proved at trial, but in no event less than Two-Million Dollars ($2,000,000.00) in damages and punitive damages, plus the cost of this suit including disbursements;

(ll)    On the Thirty-Eighth Cause of Action of Intentional Falsehood against Richard Simon, for damages in an amount to be determined at trial, but not less than Two-Million Dollars ($2,000,000) and punitive damages, plus the cost of this suit including disbursements;

(mm)   On the Thirty-Ninth Cause of Action of Defamation against Richard Simon, for damages in an amount to be determined at trial, but not less than Two-Million Dollars ($2,000,000.00) in damages, and punitive damages, plus costs of this suit including disbursements;

(nn)    Awarding to Plaintiff such other and further relief as the Court deems just and proper.

**Jury Demand**

Plaintiff demands a jury trial.

Dated:  New York, New York
       June 23, 2008

Yours, etc.
STRAZZULLO LAW FIRM, P.C.

By:  s/_____
Salvatore Strazzullo, Esq. (SS 7419)
100 Park Avenue, Suite 1600
New York, New York  10017
Tel:  (212) 551-3224
Fax:  (212) 926-5001
*Attorneys for Plaintiff Donald Frangipani*